BART M. DAVIS, IDAHO STATE BAR NO. 2696
UNITED STATES ATTORNEY
CHRISTOPHER S. ATWOOD, IDAHO STATE BAR NO. 7013
RAYMOND E. PATRICCO, DISTRICT OF COLUMBIA STATE BAR NO. 454792
ASSISTANTS UNITED STATES ATTORNEY
DISTRICT OF IDAHO
1290 W. MYRTLE ST. SUITE 500
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE: (208) 334-9375

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. |
| Plaintiff, | **RULE 11 PLEA AGREEMENT** |
| vs. | |
| JAMES HESLEP, | |
| Defendant. | |

Rev. September 2019

## I.   GUILTY PLEA

A.   **Summary of Terms.**  Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the Defendant, the attorney for the Defendant, and the Government[1] agree that the Defendant will plead guilty to Counts One and Two of the Information, which charge the Defendant with Receiving a Bribe by a Public Official, in violation of 18 U.S.C. § 201(b)(2), and Making and Subscribing a False Federal Income Tax Return, in violation of 26 U.S.C. § 7206(1). The Defendant will also admit the asset forfeiture allegation in the Information.

This plea is voluntary and did not result from force, threats, or promises, other than any promise made in this agreement.  Upon acceptance of the Defendant's guilty pleas, and the Defendant's full compliance with the other terms of this agreement, the Government, under Federal Rules of Criminal Procedure 11(c)(1)(B), will recommend a sentence within the Guidelines range calculated by the Court.  Further, attached to this plea agreement are letters from the Department of Justice, Antitrust Division (Attachment A) and the United States Attorney's Office for the Eastern District of Virginia (Attachment B) which state that the Antitrust Division and the Eastern District of Virginia will not prosecute the Defendant for any crimes based on facts contained in the statement of facts herein, subject to the Court's acceptance of the Defendant's guilty plea under the terms of this written Plea Agreement and its statement of facts.

B.   **Oath.**  The Defendant will be placed under oath at the plea hearing.  The Government may use any statement that the Defendant makes under oath against the Defendant in a prosecution for perjury or false statement.

---

[1] The word "Government" in this agreement refers to the United States Attorney for the District of Idaho.

**Plea Agreement**                    1

C.    **Waiver of Indictment and Venue.**  The Defendant hereby waives the right to prosecution by indictment, pursuant to Federal Rule of Criminal Procedure 7(b), and hereby waives any objection to venue, pursuant to Federal Rule of Criminal Procedure 18, and agrees to plead guilty to the Information as detailed herein.

## II.    WAIVER OF CONSTITUTIONAL RIGHTS AT TRIAL

The Defendant waives the following rights by pleading guilty pursuant to this agreement:  1) the right to plead not guilty to the offense(s) charged against the Defendant and to persist in that plea; 2) the right to a trial by jury, at which the Defendant would be presumed innocent and the burden would be on the Government to prove the Defendant's guilt beyond a reasonable doubt; 3) the right to have the jury agree unanimously that the Defendant was guilty of the offense; 4) the right, at trial, to confront and cross-examine adverse witnesses; 5) the right to present evidence and to compel the attendance of witnesses; and 6) the right not to testify or present evidence without having that held against the Defendant.  If the Court accepts the Defendant's guilty plea, there will be no trial.

## III.    NATURE OF THE CHARGES

A.    **Elements of the Crime.**  The elements of the crime of Receiving a Bribe by a Public Official, as charged in Count One, are as follows:

1.    The Defendant was a public official;

2.    The Defendant received something of value in return for being influenced in the performance of an official act; and

3.    The Defendant acted corruptly, that is, intending to be influenced in the performance of an official act.

The elements of the crime of Making and Subscribing a False Federal Income Tax Return, as charged in Count Two, are as follows

1.  The Defendant signed and filed a tax return for the year 2017 that he knew contained false information as to a material matter;

2.  The return contained a written declaration that it was being signed subject to the penalties of perjury; and

3.  In filing the false tax return, the Defendant acted willfully.

B.  **Factual Basis.**   The Defendant admits the following facts are true:

In 2008, the Defendant began working for the United States Department of Justice, Federal Bureau of Investigation (FBI).  The Defendant worked as a Management and Program Analyst, and in that position, was responsible for oversight of construction and services contracts for FBI buildings across the country.  As an employee of the FBI, the Defendant was a "public official."

In 2013, 2014, 2016, and 2017, the Defendant completed training entitled "Procurement Integrity Awareness for Executives and Managers."  In 2018, the Defendant completed training entitled "Procurement Integrity Overview."  The Procurement Integrity Act (48 C.F.R. § 3.000 *et seq.*) generally prohibits a federal employee, who has access to source selection and contractor bid or proposal information, from disclosing that information before the award of the contract to which the information relates.  Further, the Procurement Integrity Act prohibits a federal employee from soliciting or accepting anything of monetary value (beyond *de minimis* amounts) from anyone who has or is seeking to obtain Government business with the employee's agency.

In 2007, the Defendant formed Crow Enterprises, LLC in Virginia. In 2016, the Defendant opened up the bank account in the name of Crow Enterprises, LLC at BB&T Bank.

In December 2016, the Defendant applied for and received outside employment authorization from the FBI to work as a real estate agent for Century 21 in Chantilly, Virginia. He set up Heslep Real Estate, LLC to conduct his real estate activities.

Annually, the Defendant was required to complete FBI Security Financial Disclosure Forms under penalty of perjury. For years 2015 through 2018, the Defendant listed bank accounts at the Navy Federal Credit Union belonging to him and his wife ("NFCU personal bank accounts"). However, the Defendant omitted a personal consumer loan at the NFCU ("undisclosed NFCU personal loan"), his Wells Fargo Bank account for Heslep Real Estate, LLC ("undisclosed Wells Fargo Bank account"), and the BB&T bank account for Crow Enterprises, LLC ("undisclosed BB&T account"), over which he had control. Further, Defendant omitted all income other than his and his wife's FBI salaries.

On February 14, 2017, the Defendant completed the FBI's "No Known Conflicts of Interest with Federal Duties" certification form under penalty of perjury. Therein, the Defendant certified that (a) he did not have any financial interest in any government matter he was assigned; (b) had a responsibility to disclose any financial or personal interest that conflicted with his government duties; and (c) the FBI's Standards of Conduct prohibited the Defendant from using non-public information acquired by virtue of his official position for his own gain or for the gain of any other private party.

In 2017, the FBI broke ground on the construction of a data center in Pocatello, Idaho (the "Pocatello Data Center project"). The Pocatello Data Center project involved construction of a two-building, 140,000 square-foot complex that would accommodate data

halls containing computer equipment and office space. The purpose was to consolidate multiple FBI data centers from across the country and improve efficiency and cyber-security. In 2017, Compendium International, Inc. ("C2i") performed construction management services for the Pocatello Data Center project. In 2018, the FBI awarded a sole source contract to S-1, a Native Alaska vendor, to replace C2i and provide construction management services, as well as operational and maintenance services, for the Pocatello Data Center project.

In 2017, the Defendant became the Contracting Officer Representative (COR) for the Pocatello Data Center project, for the construction contract with a construction company. In that position, he had management and oversight responsibilities over the construction of the Pocatello Data Center.

R.B. was the owner of L-1, a construction management and operations and maintenance company. In approximately 2008, R.B. became a business acquaintance of the Defendant when they worked together on the construction of the Terrorist Screening Center in Vienna, Virginia (the "Terrorist Screening Center project"). The Defendant was the Unit Chief on the Terrorist Screening Center project until 2015.

Beginning in 2017, L-1 was a sub-contractor – first for C2i and then for S-1 – on the Pocatello Data Center project. L-1 first performed construction management services, and once construction was complete, performed operational and maintenance services.

In 2018, the FBI offered a contract for maintenance services at the Terrorist Screening Center. S-1 submitted a bid that identified L-1 as a partner and listed L-1 employees who would work on the contract.

In 2016 through 2018, the Defendant received the following payments and items of value from R.B. and L-1:

  1. From November 2016 through October 2018, R.B. and L-1 made eighteen (18) deposits totaling $120,000 into the Defendant's undisclosed BB&T account. From the undisclosed BB&T account, the Defendant made $56,900 in payments – via check or automated payment – on the undisclosed NCFU personal loan. Also from the undisclosed BB&T account, the Defendant made checks out to cash and deposits into his NCFU personal bank accounts. From his NCFU personal bank accounts, the Defendant made home mortgage, car, credit card, and vacation travel payments, among other personal expenditures at retail stores, such as a pair of diamond earrings that cost $5,300. The Defendant also made seventeen (17) ATM cash withdrawals totaling $7,120.

  2. In March 2017, R.B. purchased first class Amtrak tickets totaling $1,648 for a trip R.B. and the Defendant took from Washington, D.C. to New York City on March 27, 2017.

  3. In April 2017, R.B. emailed to the Defendant four Washington Nationals baseball tickets and a parking pass. In the email, R.B. wrote: "print these bad boyees."

  4. In June 2017, the Defendant and his wife attended a birthday party for R.B. and other L-1 employees at the Backyard Grill in Chantilly, Virginia.

  5. For a week in July 2017, the Defendant stayed at a rented beach house in Nags Head, North Carolina. R.B. paid $5,062 for the house rental. The payment receipt bears R.B.'s name, but the Defendant's home address, as contact information.

6.      In November 2018, L-1 invited the Defendant to L-1's Holiday Party. The Defendant was the only FBI employee invited. The Defendant and his wife attended.

7.      In December 2018, R.B. organized, financed, and attended a 50th birthday celebration and trip for the Defendant to Dallas, Texas. R.B. purchased airfare, lodging, and tickets to a Dallas Cowboys football game for the Defendant. The Defendant's first-class airfare cost $802. The Defendant's hotel cost $616.

8.      The total value of items that R.B. and L-1 provided to the Defendant was at least $128,128.

The Defendant received these payments and items of value from R.B. and L-1 in return for being influenced in his performance of the following official acts:

1.      In or about March 2017, the Defendant sought and received authorization from the FBI contracting officer to allow L-1 employees who traveled to work at the Pocatello Data Center project site to stay at R.B.'s personal residence in Pocatello, instead of at a hotel, and for R.B. to receive their lodging *per diem* reimbursements directly from the FBI. For each L-1 employee, for each night, the FBI paid $93 to R.B., an amount in excess of what the Federal Acquisition Regulations allowed and without R.B. having provided the required supporting lodging receipts. This amounted to approximately $16,000 per month in lodging *per diem* payments from the FBI to R.B. in 2017 and 2018.

2.      In 2018, the FBI began preparing a Statement of Work (SOW) for a bridge contract for the Pocatello Data Center project. The bridge contract was for a vendor to complete construction management services for the Pocatello Data Center project, and once construction was completed, provide operational and maintenance services as the facility

became operational (the "bridge contract"). Among other things, the SOW described the qualifications necessary for the vendor and the work that the vendor would perform for the FBI. Vendors were to use the SOW to bid on the contract. The bridge contract was for one year, with two six-month options, and was worth approximately $12.2 million.

      3.      The Defendant sent a Word version of the draft SOW to R.B. At the time, the Defendant understood that S-1 was potential bidder on the bridge contract, and that L-1 would perform the work thereunder as a pass-through sub-contractor for S-1. The Defendant was aware from training that the Federal Procurement Act prohibited him from disclosing the SOW to R.B. and L-1 before the award of the bridge contract. The Defendant did not send the draft SOW to other potential bidders on the bridge contract.

      4.      In February, March, and April 2018, R.B. made suggested edits to the draft SOW – captured in Word "tracked changes" – and returned a revised version of the draft to the Defendant. In August 2018, the Defendant transmitted the draft SOW – revised by R.B. – to FBI personnel working on the bridge contract. R.B.'s revisions were included in the SOW that was incorporated into the final request for proposal for the bridge contract.

      6.      In September 2018, the FBI Contracting Officer on the Pocatello Data Center Project emailed the Defendant and other FBI personnel the "pricing spreadsheet" template for the bridge contract and requested that the Defendant populate it. Notwithstanding suggestions by FBI personnel that the Defendant use applicable Idaho labor rates, the Defendant included Washington, D.C. metropolitan-area labor rates, at an approximate 30 percent premium above applicable Idaho labor rates. The Defendant challenged those FBI personnel who questioned his labor rates to better educate themselves,

and threatened to raise the issue to the "front office."  At the time, the Defendant knew that L-1 employees would comprise most of the labor force for the bridge contract.

7.      In September 2018, the Defendant elevated the labor pricing issue to the office of the FBI's Assistant Director.  On September 13, 2018, the FBI Assistant Director ordered FBI personnel on the project to "get in line" with the Defendant's pricing approach.

8.      On September 21, 2018, the FBI issued a Request for Quote for the bridge contract that incorporated R.B.'s edits to the SOW and the Defendant's increased labor rates.  On September 28, 2018, the FBI awarded the bridge contract to S-1.  As a pass-through sub-contractor to S-1, L-1 performed the work under the bridge contract.

9.      In the Fall of 2018, the Defendant made telephone calls to the Contracting Officer and Team Supervisor on the Terrorist Screening Center project.  The Defendant recommended that S-1 be awarded the maintenance contract for the Terrorist Screening Center, and because S-1 was an Alaskan Native company, the FBI could award the contract to S-1 without open bidding.  In January 2019, after an open bidding process, the FBI awarded the maintenance contract to S-1.  L-1 employees performed work on the contract.

In performing the above official acts, the Defendant acted corruptly, that is, with the intent to be influenced.

On December 18, 2018, special agents of the Department of Justice-Office of the Inspector General, interviewed the Defendant.  Prior to the interview, the Defendant waived his *Garrity* rights orally and in writing.  The Defendant made the following false or misleading statements:

1.      L-1 did not have any part in the drafting of the SOW for the bridge contract that was awarded to S-1 in September 2018.

2.      When asked if he "ever accepted anything of value from a contractor or subcontractor" over the past two to three years, the Defendant replied, "No, I mean cookies." The Defendant further stated that he had never borrowed money from R.B., and that he had not provided R.B. with any money outside of paying the Defendant's portion of a meal that R.B. purchased for a group. Among other items of value, the Defendant omitted the $120,000 in deposits that R.B. made to the Defendant's BB&T account.

3.      When asked if he had ever been to social events with R.B. or other L-1 employees, the Defendant responded: "I, I have not been, not so much this year because we've been traveling so much you know." Further, the Defendant stated that he attended a Washington Nationals baseball game and a hockey game years ago with R.B., but that he paid for his own tickets. Among other social events, the Defendant omitted the 50th birthday trip to Dallas, and Dallas Cowboys game, arranged and financed by R.B., that occurred one week prior to the interview.

4.      When asked if he vacationed with R.B. in North Carolina, the Defendant stated that he had "stopped by" R.B.'s beach house "to say hi," but never stayed overnight because the "optics" would be "very bad" and the value would exceed the dollar value threshold he could receive from a contractor. The Defendant omitted that R.B. paid $5,062 for the Defendant's beach house rental in Nags Head, North Carolina in July 2017.

On or about October 13, 2018, the Defendant manually signed and caused to be filed a Form 1040 federal income tax return for the tax year 2017 that he knew contained false information as to a material matter. Specifically, on Line 22 "Total Income," the Defendant reported that his total income for the tax year 2017 was $236,110, whereas he then and there knew that his total income was at least $286,110. Namely, the Defendant knew that in tax

year 2017 he received an additional $50,000 in cash payments from R.B. and L-1 that he did not report. This resulted in a tax loss to the IRS of $15,353. The return contained a written declaration that it was being signed subject to the penalties of perjury. In causing the false tax return to be filed, the defendant acted willfully. On or about January 8, 2019, the Defendant filed an amended Form 1040 federal income tax return for tax year 2017 and paid $13,931 in taxes due and owing for tax year 2017.

## IV.    SENTENCING FACTORS

A.    **Penalties.** The crime of Receiving a Bribe by a Public Official, as charged in Count One, is punishable by:

1.    a term of imprisonment of 15 years;

2.    may be disqualified from holding any office of honor, trust, or profit under the United States;

3.    a term of supervised release of not more than 3 years; and

4.    a maximum fine of $250,000, or not more than three times the monetary equivalent of the thing of value, whichever is greater, and a special assessment of $100.

The crime of Making and Subscribing a False Federal Income Tax Return, 26 U.S.C. § 7206(1), as charged in Count Two, is punishable by:

1.    a term of imprisonment of 3 years;

2.    a term of supervised release of not more than 1 year; and

3.    a maximum fine of $250,000, and a special assessment of $100.

B.    **Supervised Release.** The Court may impose a period of supervised release. No agreement exists as to its length.

The law permits the combined prison time and term of supervised release to exceed the maximum term of incarceration for the crime(s) to which the Defendant is pleading guilty. Violation of any condition of supervised release may result in further penalties and prosecution.

C.    **Fines and Costs.**  The Court may impose a fine.  No agreement exists as to its amount of the fine.  The Court may also order the Defendant to pay the costs of imprisonment, probation, and supervised release.

D.    **Special Assessment.**  The Defendant will pay the special assessment(s) before sentencing and will furnish a receipt at sentencing.  Payment will be made to:

> The United States District Court, Clerk's Office
> Federal Building and United States Courthouse
> 550 West Fort Street, Fourth Floor
> Boise, Idaho 83724

E.    **Restitution.**  In addition to paying any forfeiture, fine, and costs imposed, the Defendant also agrees to pay restitution equal to the full amount of loss caused to any victim. The Defendant agrees to pay $15,353 to the Internal Revenue Service (representing tax due and owing).  Notwithstanding, the Defendant and the Government agree that the Defendant already has paid $13,931 in restitution to the Internal Revenue Service.  Therefore, the Defendant and the Government agree that the Court shall enter a restitution order of $15,353 to reflect the loss to the Internal Revenue Service, but the Court will also indicate that the Defendant has already paid all but $1,422 of that amount.  Further, the Defendant agrees to pay restitution to the United States Department of Justice, Federal Bureau of Investigation, if any, in an amount determined by the Court at the time of sentencing.  The Defendant agrees that all monetary penalties imposed by the Court, including restitution, will be due immediately and can immediately be enforced by the Government (whether through 18

U.S.C. § 3613 or otherwise). The Defendant agrees that the payment schedule or plan is neither the only method, nor a limitation on the methods, available for enforcing the judgment. It is simply a schedule or plan for minimum payments. The Defendant is aware that voluntary payment of restitution prior to adjudication of guilt is a factor the Court can consider if the Defendant has accepted responsibility under U.S.S.G. § 3E1.1.

F.     **Forfeiture.** The Court will enter a forfeiture order as part of the Defendant's sentence. The Defendant will immediately forfeit to the Government the property set out in: this agreement, the charging document to which the Defendant is pleading, and any Bill of Particulars. Defendant agrees that those documents provide statutory authority for forfeiture.

1.     Additionally, Defendant agrees to forfeit the following.

a.     Forfeiture Money Judgment for Unrecovered Property. The Court may impose forfeiture of a monetary sum, or money judgment, equivalent to unrecovered property including unrecovered proceeds of the offense of conviction obtained and controlled by the Defendant, property derived from or traceable to such proceeds, and/or unrecovered property the Defendant used to commit or facilitate the offense, as authorized by applicable statutes. Defendant agrees to a forfeiture judgment of at least $128,128.

b.     Substitute Assets Up To the Value of Unrecovered Property Subject to Forfeiture. Pursuant to 21 U.S.C. § 853(p) and other applicable statutes, the Defendant agrees to forfeit substitute assets, or any other property of the Defendant up to the value of any unrecovered property subject to forfeiture. Post-sentencing forfeiture of substitute assets does not entitle the Defendant to resentencing.

2.     Defendant makes the following additional agreements and waivers related to forfeiture.

a.     Regarding the above property, the Defendant: (a) is the sole owner, unless otherwise set out herein; (b) hereby withdraws any claims filed in any administrative or civil forfeiture proceeding; (c) agrees to assist fully in the forfeiture and to take all steps necessary to pass clear title to the Government; (d) will testify truthfully in any forfeiture proceeding and will not assist a third party in asserting a claim; (e) agrees to administrative or civil forfeiture, or abandonment, if the Government does not pursue criminal forfeiture; and (f) agrees that variations or errors in serial numbers or property descriptions shall not affect forfeiture.

b.     Forfeiture is separate from all other penalties, including fines and restitution. As with other penalties, the Court will determine forfeiture at sentencing. Any stated or pleaded forfeiture amount is an "at least" amount and the Court may impose greater or additional forfeitures. The Defendant waives requirements regarding notice and pronouncement of forfeiture, including: (a) in charging documents, (b) at the change of plea hearing, (c) at sentencing, and (d) in the judgment. See FED. R. CRIM. P. 11(b)(1)(J), 32.2, and 43(a).

c.     The Defendant waives all challenges and objections, on any grounds, to any forfeiture in accordance with this agreement. If this agreement is withdrawn for any reason, the Defendant waives the right to contest all administrative and civil forfeitures that began before the withdrawal. The Defendant agrees to hold the United States, its agents, and employees harmless from any claims related to seizures or forfeiture in this case or the related investigation. The forfeiture provisions of this agreement will survive the Defendant's death and bind the Defendant's heirs, successors and assigns until forfeiture is

fully collected. Any forfeited property directed to victims shall not be returned even if Defendant's conviction is overturned or abated.

           d.      The District Court shall retain jurisdiction to consider and rule on forfeiture and related issues, unless a higher Court directs otherwise.

## V.    SEIZED PROPERTY: ABANDONMENT AND WAIVER

The Defendant abandons, releases, and waives any interest in property seized or otherwise obtained by the Government or law enforcement in this case unless specific exceptions are noted in this agreement. Such property will be disposed of, destroyed, sold, or transferred in the Government's sole discretion. Such disposition shall not constitute satisfaction of any assessment, fine, restitution, forfeiture, cost of imprisonment, or any other penalty that this Court may impose.

## VI.    PAYMENT OF TAXES OR COOPERATION IN TAX PROCEEDINGS

The defendant agrees either to pay unpaid tax due and owing, and accrued interest, consistent with paragraph A below or to cooperate in the civil examination, assessment, and collection of unpaid tax due and owing, penalties and interest as set forth in paragraph B below.

        **A.**      <u>**Payment of Tax Due and Owing and Accrued Interest**</u>. The defendant will pay any unpaid tax due and owing, and accrued interest for his 2017 Form 1040 joint income tax return prior to or at sentencing. The Government represents that it has consulted with the IRS and that the IRS has represented that, if the Government agrees that payment represents defendant's tax due and owing and accrued interest for his 2017 Form 1040 joint income tax return, the IRS will not pursue any further criminal investigation related to the defendant and his associated corporate entities for tax year 2017.

**B.    <u>Cooperation in Tax Proceedings.</u>**  The defendant agrees to cooperate with the Internal Revenue Service ("IRS") in its civil examination, determination, assessment, and collection of income taxes relating to his tax returns and any related corporate/entity tax returns for tax year 2017, and further agrees not to conceal, transfer, or dissipate funds or property that could be used to satisfy such taxes, penalties, and interest.  The defendant agrees to provide the IRS any documentation in the defendant's possession and/or control requested by the IRS in connection with its civil examination, determination, assessment, and collection of such taxes prior to sentencing.

The defendant also agrees to work diligently with the IRS to resolve the liability for all taxes, interest, and penalties due and owing to the IRS, including all taxes, interest, and penalties on his individual and any related corporate/entity liabilities for the tax year 2017.  Nothing in this agreement shall limit the IRS in its civil determination, assessment, and collection of any taxes, interest, and/or penalties that the defendant may owe.

The defendant agrees to repatriate any funds or assets held in any foreign country or outside the United States as necessary to pay his tax liability and restitution.

The defendant agrees that the IRS may seek to impose penalties on any additional tax as identified by civil examination for tax year 2017 under 26 U.S.C. § 6663.  The defendant does not concede that such penalties apply.

The defendant agrees to sign statute extensions (Form 872) with the IRS, prior to the time of sentencing, for tax year 2017, if requested.

The defendant agrees that nothing in this agreement shall limit the IRS in its lawful examination, determination, assessment, or collection of any taxes, penalties or interest and/or penalties due from the defendant for the time periods not covered by this agreement.

The defendant agrees that nothing in this agreement shall preclude or bar the Internal Revenue Service from the assessment and/or collection of any additional tax liability, including interest and penalties, determined to be due and owing from the defendant by the Internal Revenue Service for 2017.

The defendant agrees to give up any and all objections that could be asserted to the Examination Division of the Internal Revenue Service receiving materials or information obtained during the criminal investigation of this matter, including materials and information obtained through grand jury subpoenas.

The defendant agrees that any statements made by him to the IRS and/or in this Agreement shall be admissible against the defendant without any limitation in any civil proceeding and the defendant stipulates to the authenticity and admissibility, in any civil proceeding, of any documentation provided by the defendant to the IRS. The defendant hereby waives any protection afforded by Rule 410 of the Federal Rules of Evidence and Rule 11(f) of the Federal Rules of Criminal Procedure with regard to any such statements and documentation. In the event that the defendant withdraws from this agreement prior to pleading guilty and/or fails to fully comply with any of the terms of this agreement, the United States will, at its option, be released from its obligations under this agreement, but under no circumstances shall the defendant be released from the agreements and waivers made by him in this and the preceding paragraphs.

## VII.   UNITED STATES SENTENCING GUIDELINES

A.   **Application of Sentencing Guidelines.** The Court must consider the U.S.S.G. in determining an appropriate sentence under 18 U.S.C. § 3553. The defendant agrees that the

Court may consider "relevant conduct" in determining a sentence pursuant to U.S.S.G. § 1B1.3.

The Court is not a party to this agreement and the agreement does not bind the Court's determination of the U.S.S.G. range. The Court will identify the factors that will determine the sentencing range under the U.S.S.G. The Court has complete discretion to impose any lawful sentence, including the maximum sentence possible.

Recognizing that this agreement does not bind the Court, the parties agree to the recommendations and requests set forth below.

**B.    Sentencing Guidelines Recommendations and Requests.**

1.    **Government's Statements at Sentencing.** The Government reserves the right to allocute fully at sentencing regarding any sentencing recommendation. The Government may rely on or submit any information, including relevant conduct, in support of its recommendation regardless of whether the agreement or the pre-sentence investigation report contain this information. Any exception must be specified in this agreement.

2.    **Acceptance of Responsibility.** If the Defendant clearly accepts responsibility for the offense, the Defendant will be entitled to a reduction of two levels in the combined adjusted offense level, under U.S.S.G. § 3E1.1(a). The Government will move for an additional one-level reduction in the combined offense level under § 3E1.1(b) if the following conditions are met: (1) the Defendant qualifies for a decrease under § 3E1.1(a); (2) the offense is level 16 or greater; and (3) the Defendant has timely notified authorities of the Defendant's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. If, before sentence is imposed, the Defendant fails to meet U.S.S.G. § 3E1.1's criteria, or acts in a

manner inconsistent with acceptance of responsibility, the Government will withdraw or decline to make the motion.

3. **Amount of Loss.** The parties agree that the amount of loss for Count One (Receiving a Bribe by a Public Official) is $128,128. The parties agree that the amount of loss for Count Two (Making and Subscribing a False Federal Income Tax Return) is $15,353.

4. **Guidelines Calculations.** The parties agree that the following USSG calculations apply:

### Count One

| | | |
|---|---|---|
| a. | § 2C1.1(a)(1): Base Offense Level | 14 |
| b. | § 2C1.1(b)(1): More than one bribe | +2 |
| c. | § 2C1.1(b)(2)/§ 2B1.1(b)(1)(E): Value > $95,000 | +8 |
| d. | Adjusted Offense Level | = 24 |

### Count Two

| | | |
|---|---|---|
| e. | § 2T1.1(a)(1)/ § 2T4.1(D): Base Offense Level | 12 |
| f. | § 2T1.1(b)(1): Income > $10,000 from crime | +2 |
| g. | Adjusted Offense Level | = 14 |

### Grouping

| | | |
|---|---|---|
| h. | § 3D1.4(a) (Count 1) | 1 Unit |
| i. | § 3D1.4(c) (Count 2) | No increase |
| j. | Combined Offense Level | = 24 |
| k. | § 3E1.1(a) & (b): Acceptance of Responsibility | - 3 |
| l. | Final Offense Level | = 21 |

5.    **Downward Departure or Variance Request by Defendant.** If the Defendant wishes to seek a departure or variance, the Defendant must provide written notice to the Government, along with the reasons and basis therefore, 21 days before the date set for sentencing.

## VIII.  COOPERATION

A.    **Truthful Information and Assistance.** The Defendant promises to provide truthful and complete information, including testimony in legal and administrative proceedings, to the Government and its investigative agencies about the Defendant's role and the roles of all others involved in offense-related behavior and other criminal activity.   The Defendant shall not attempt to protect anyone through false information or omission.  The Defendant will not falsely implicate anyone.  Any intentional deviation from the truth in any of the Defendant's testimony may result in prosecution for perjury and obstruction of justice. The Defendant's duty under this agreement is to tell the truth whether or not it supports the Government's case against anyone.  This agreement is not contingent upon the conviction of any person or the forfeiture of any property, and Defendant understands that.

The Defendant agrees to cooperate in good faith.  This means the Defendant will not only respond truthfully and completely to all questions asked but will also volunteer all information that is reasonably related to subjects discussed.  In other words, the Defendant may not omit facts about crimes, participants, or the Defendant's involvement, and then claim not to have breached the agreement because the Defendant was not specifically asked.  This agreement will be breached by any action or statement inconsistent with continued cooperation.  The attorney for the Government has the sole power and discretion to determine if breach has occurred.   The Defendant acknowledges that any breach releases the

Government from its obligations under this agreement and allows the Government to withdraw from the agreement. The agreement, however, will still bind the Defendant.

The Defendant agrees to be available for interviews to prepare for testimony. If requested, the Defendant will submit to Government-administered polygraph examinations.

The Defendant agrees to identify all property related to the crimes to which the Defendant will plead guilty, and property related to any relevant conduct. The Defendant will identify the extent of any person's or entity's (including Defendant's) interest in any such property. The Defendant agrees to assist the Government recover and forfeit such property.

B.    **Use of Information Against Defendant.** The Government will not use against the Defendant information provided by the Defendant pursuant to this agreement if the information was new, previously unknown to law enforcement, and was not obtainable from an independent source. If the Defendant breaches this agreement, the Government is free to use any information provided by the Defendant for any purpose. The Government is always free to provide to the Court any information provided by the Defendant.

C.    **Substantial Assistance Determination.** If the Government determines that the Defendant's cooperation amounts to substantial assistance in the investigation or prosecution of others, the Government will request that the Court depart downward from the applicable U.S.S.G. range. Otherwise, the Government will not move for a downward departure. The Government's decision will be made after considering the factors prescribed in U.S.S.G. § 5K1.1. The Government's specific recommendation will turn on the facts of the case, the likely sentence absent an agreement, and the extent and value of the cooperation provided. The Government's decision will not constitute grounds for the Defendant to withdraw from this agreement.

D.    **Defendant's Assumption of Risk.**  Knowing the possible consequences, the Defendant agrees freely and voluntarily to cooperate with the Government.   The Defendant's attorney knows of the Defendant's cooperation and agrees that the Defendant shall enter into this agreement.  The Defendant hereby absolves the Government, including its employees, from any liability associated with cooperation.

## IX.    WAIVER OF RIGHT TO DIRECT APPEAL AND TO COLLATERAL ATTACK UNDER 28 U.S.C. § 2255

A.    **Waiver:**  In exchange for this agreement, and except as provided in subparagraph B, the Defendant waives any right to appeal or collaterally attack the entry of plea, the conviction, the entry of judgment, and the sentence, including forfeiture and restitution.  This waiver includes any challenge to the constitutionality of any statute of conviction including arguments that the admitted conduct does not fall within any statute of conviction.

The Defendant acknowledges that this waiver will result in the dismissal of any direct appeal or collateral attack the Defendant might file seeking to challenge the plea, conviction or sentence in this case.  Further, the filing of such an appeal or collateral attack will breach this agreement and allow the Government to withdraw from it, as well as to take other remedial action.

If the Defendant believes the Government has not fulfilled its obligations under this agreement, the Defendant will object at the time of sentencing; further objections are waived.

B.    **Exceptions:**

1.    **Direct Appeal:**  Notwithstanding subparagraph A, the Defendant may  file one direct appeal if one of the following unusual circumstances occurs:

a.    the sentence imposed by the  Court exceeds the statutory maximum;

b.    the Court arrived at an advisory USSG  range by applying an upward departure under chapter 5K of the USSG; or

c.   the Court exercised its discretion under 18 U.S.C. § 3553(a) to impose a sentence that exceeds the advisory USSG range as determined by the Court.

The Defendant understands that the above circumstances occur rarely and that in most cases this agreement completely waives all appellate rights.

2.   **Motion Under 28 U.S.C. § 2255:**  Notwithstanding subparagraph A, the Defendant may file an ineffective assistance of counsel claim in a 28 U.S.C. § 2255 motion.

## X.    PROVIDING INFORMATION FOR THE PRESENTENCE REPORT

The Defendant agrees to provide financial information and any other information requested by a representative of the United States probation office for use in preparing a pre-sentence investigation report, and agrees that the United States probation office may share all financial information with the Government.  Failure to execute releases or to provide information for the pre-sentence investigation report violates this agreement and relieves the Government of its obligations from it.  Such failure by the Defendant and response by the Government will not, however, constitute grounds for withdrawing the plea of guilty unless the Government so requests.  Providing materially false information will subject the Defendant to additional penalties, including an enhancement under U.S.S.G. § 3C1.1.

## XI.    DISCLOSING FINANCIAL INFORMATION

The Defendant agrees to disclose all the Defendant's assets and sources of income to the Government, including all assets over which the Defendant exercises or exercised direct or indirect control, or in which the Defendant has had any financial interest.  This includes all community property.  The Defendant also agrees to cooperate in obtaining any records relating to ownership of assets when sought by the Government.  The Defendant agrees truthfully to complete a personal financial statement within 14 days from the date the Defendant signs this agreement or from the date the financial statement is provided to the Defendant or counsel,

whichever is later.  The Defendant agrees to provide updates with any material changes in circumstances, as described in 18 U.S.C. § 3664(k), within 7 days of the event giving rise to the changed circumstances.  The failure timely and accurately to complete, sign, and update the financial statements may constitute failure to accept responsibility under U.S.S.G. § 3E1.1, as well as other things.

The Defendant authorizes the Government:  (a) to obtain a credit report on the Defendant; (b) to inspect and copy all financial documents and information held by the United States probation office; and (c) to obtain all financial records related to the Defendant.

Before sentencing, Defendant agrees not to dissipate any assets without the consent of both the Government's financial litigation unit and asset forfeiture unit.  If any assets are sold, any sale proceeds will be deposited with the Clerk of Court and, upon sentencing, paid toward any monetary penalties ordered in the judgment.

## XII.   NO RIGHT TO WITHDRAW PLEA

The Defendant understands that the Court may not follow the recommendations or requests made by the parties at the time of sentencing.  The Defendant cannot withdraw from this agreement or the guilty plea, regardless of the Court's actions.

## XIII.   CONSEQUENCES OF VIOLATING AGREEMENT

A.   **Government's Options.**  If the Defendant fails to keep any promise in this agreement or commits a new crime, the Government is relieved of any obligation:  1) to make a sentencing recommendation consistent with the terms promised in this agreement; and 2) not to prosecute the Defendant on other charges, including charges not pursued due to this agreement. Such charges may be brought without prior notice.  If the Government determines that a breach warrants prosecution before sentencing, it may withdraw from this agreement in its entirety.  In addition, if the Government determines after sentence is imposed that the Defendant's breach of

the agreement warrants further prosecution, the Government may choose between letting the conviction(s) under this agreement stand or vacating such conviction(s) so that charge(s) may be re-prosecuted.

The Government's election to pursue any of the above options provides no basis for the Defendant to withdraw the guilty plea(s) made pursuant to this agreement.

B.    **Defendant's Waiver of Rights.**  If the Defendant fails to keep any promise made in this agreement, the Defendant gives up the right not to be placed twice in jeopardy for the offense(s) to which the Defendant entered a plea of guilty or which were dismissed under this agreement.  In addition, for any charge that is brought as a result of the Defendant's failure to keep this agreement, the Defendant gives up:  (1) any right under the Constitution and laws of the United States to be charged or tried in a more speedy manner; and (2) the right to be charged within the applicable statute of limitations period if the statute of limitations has expired.

Furthermore, if the Defendant does not enter an acceptable plea, the Government will move to continue the trial now set to allow the Government adequate time to prepare.  The Defendant agrees not to contest such a continuance, and agrees that the resulting delay would be excludable time under 18 U.S.C. § 3161(h).

## XIV.  MISCELLANEOUS

A.    **No Other Terms.**  This agreement is the complete understanding between the parties, and no other promises have been made by the Government to the Defendant or to the attorney for the Defendant.  This agreement does not prevent any Governmental agency from pursuing civil or administrative actions against the Defendant or any property.  Unless an exception to this paragraph is explicitly set forth elsewhere in this document, this agreement does not bind or obligate Governmental entities other than that specified as the Government in this agreement (i.e., the United States Attorney's Office for the District of Idaho).

B.    **Plea Agreement Acceptance Deadline.**  This plea offer is explicitly conditioned on the Defendant's notification of acceptance of this agreement no later than 5:00 p.m. on November 25, 2020.

## XV.    UNITED STATES' APPROVAL

I have reviewed this matter and the agreement.  This agreement constitutes a formal plea offer from the Government.  Any oral discussions with the Defendant and defense counsel about a plea do not constitute a plea offer.  Any written offer or agreement made before this agreement is no longer a valid offer by the Government and is rescinded.  I agree on behalf of the United States that the terms and conditions set forth above are appropriate and are in the best interests of justice.

BART M. DAVIS
UNITED STATES ATTORNEY
By:

_____        11/30/2020
RAYMOND E. PATRICCO                            Date
Assistant United States Attorney

## XVI.    ACCEPTANCE BY DEFENDANT AND COUNSEL

I have read and carefully reviewed every part of this agreement with my attorney.  I understand the agreement and its effect upon my potential sentence.  Furthermore, I have discussed all of my rights with my attorney and I understand those rights.  No other promises or inducements have been made to me, directly or indirectly, by any agent of the Government, including any Assistant United States Attorney, concerning the plea to be entered in this case.  I understand that this agreement is a formal plea offer from the Government.  Any oral discussions between the Government and me or my counsel about a plea do not constitute a plea offer.  Any

written offer or agreement made before this agreement is no longer valid and is rescinded. In addition, no one has threatened or coerced me to do, or to refrain from doing, anything in connection with this case, including entering a guilty plea. I understand that, if I am not a citizen or naturalized citizen of the United States, by pleading guilty in this case it is virtually certain that I will be removed from the United States. I am satisfied with my attorney's advice and representation in this case.

_____          11/11/2020
James Heslep                              Date
Defendant

     I have read this agreement and have discussed the contents of the agreement with my client. This document accurately sets forth the entirety of the agreement. I have conveyed all written offers from the Government to the Defendant pursuant to Missouri v. Frye, 132 S. Ct. 1399, 1408-09 (2012). I understand that this agreement is a formal plea offer from the Government. Any oral discussions between the Government and me or my client about a plea do not constitute a plea offer. Any written offer or agreement made before this agreement is no longer valid and is rescinded. I have discussed with my client the fact that if my client is not a citizen or naturalized citizen of the United States, by pleading guilty in this case, it is virtually certain that my client will be removed from the United States. I concur in my client's decision to plead guilty as set forth above.

_____          NOVEMBER 11, 2020
Sudeep Bose, Esq.        VSB 42617        Date
Attorney for the Defendant